# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| Theodore John "TJ" Heuer | ) |
| described further in Attachments | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

Case No.   2:19-mj-5370

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachments A-1 and A-2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| *See Attachment B* | *See Attachment B* |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**LOGAN BONIFAS, SPECIAL AGENT DRUG ENFORCEMENT ADMINISTRATION**

_____
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____

_____
*Judge's signature*

City and state:  Los Angeles, California

HONORABLE FREDERICK F. MUMM

_____
*Printed name and title*

AUSA:  Ali Moghaddas – 213-393-5735

**ATTACHMENT A-1**

PERSON TO BE SEARCHED

The person of Theodore John "TJ" Heuer ("HEUER"), date of birth September 29, 1990, with California driver's license number Y9151687.  HEUER's California Department of Motor Vehicle records list him as standing 6'2" tall with brown hair and blue eyes.

The search of HEUER shall include any and all clothing and personal belongings, digital devices, backpacks, wallets, briefcases, purses, and bags that are within HEUER's immediate vicinity and control at the location where the search warrant is executed.  The search shall not include a strip search or a body cavity search.

**ATTACHMENT A-2**

PREMISE TO BE SEARCHED

The SUBJECT PREMISES to be searched is in the Villa Treatment Center, 5051 Hood Dr., Woodland Hills, CA, 91364, which is a single-family home operating as a residential treatment facility.  Law enforcement shall attempt to determine the rooms, bathrooms, storage units, garages, detached structures, sheds, safes, lockers, and safety deposit boxes assigned for HEUER's use, on the date of execution of the search warrant.  The search shall be of those rooms, bathrooms, storage units, garages, detached structures, sheds, safes, lockers, and safety deposit boxes assigned for HEUER's use and also shall include any vehicles located on the premises used by HEUER.

**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute and to possess with intent to distribute controlled substances) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining

ii

to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

     e.  Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

     f.  Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

     g.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

     h.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to

show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

i.   Records, documents, programs, applications, materials, or conversations relating to the trafficking of drugs, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed;

j.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

k.   Contents of any calendar or date book;

l.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

m.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

n.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries,

configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

   ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

   iii. evidence of the attachment of other devices;

   iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

   v.   evidence of the times the device was used;

   vi.  passwords, encryption keys, biometric keys and other access devices that may be necessary to access the device;

   vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

   viii.    records of or information about Internet Protocol addresses used by the device;

   ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.    As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

II. <u>**SEARCH PROCEDURE FOR DIGITAL DEVICES**</u>

3.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine

vi

whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

        ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

        iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

        c.  If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

        d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

        e.  If the search determines that a digital device does contain data falling within the list of items to be seized,

the government may make and retain copies of such data, and may access such data at any time.

      f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    4.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

        a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

        b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

        c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

        d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

        e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

        f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

        g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, law enforcement is permitted to: (1) depress HEUER's thumb and/or

fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of HEUER's face with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Logan D. Bonifas, being duly sworn, declare and state as
follows:

## I. **PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a warrant to
search:

a.    The person of Theodore John "TJ" Heuer ("HEUER"),
as described more fully in Attachment A-1; and

b.    The room and storage spaces assigned to HEUER at
5051 Hood Dr., Woodland Hills, CA 91364 (the "SUBJECT
PREMISES"), as described more fully in Attachment A-2.

2.    The requested search warrants also seek authorization
to seize evidence, fruits, or instrumentalities of violations of
21 U.S.C. § 841(a)(1) (distribution and possession with intent
to distribute controlled substances) and 21 U.S.C. § 846
(conspiracy and attempt to distribute and possess with intent to
distribute controlled substances) (the "Subject Offenses"), as
described more fully in Attachment B.  Attachments A-1, A-2, and
B are incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrants,
and does not purport to set forth all of my knowledge of or
investigation into this matter.  Unless specifically indicated

otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.    I am a Special Agent with the United States Drug Enforcement Administration ("DEA"), and have been so employed since April 2019.  I am currently assigned to the DEA's High Intensity Drug Trafficking Area ("HIDTA") division in Los Angeles.  Additionally, I am a member of the HIDTA Opioid Response Team, HIDTA Group 45, which is tasked with investigating suspected opioid-related overdose deaths in Los Angeles County.

5.    As a Special Agent, I received sixteen weeks of comprehensive, formalized instruction by the DEA at the Department of Justice Training Center on various topics, including drug identification, money laundering techniques, patterns of drug trafficking, methods of operation used by members of drug conspiracies, the exploitation of narcotics traffickers' telecommunications devices, criminal law, surveillance, and decoding drug related conversations.

6.    Prior to my employment with the DEA, I was employed for three years by the Ohio State Highway Patrol as a State Trooper.  As a State Trooper, I interviewed drug users, buyers, sellers, manufacturers, transporters, and informants, and I discussed with them the various methods they used to safeguard their drug stashes and illegal proceeds and avoid detection by law enforcement.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.   As discussed in greater detail below, on or about September 29, 2019, 38 year-old C.N. died of a suspected drug overdose in a motel room registered to HEUER.  HEUER, a known drug distributor who sells drugs, including fentanyl, admitted that he was with C.N. since the day prior to her death and that he only left C.N. 30 minutes before she was found dead.  Prior to the Emergency Medical Technicians' ("EMT") and law enforcement's arrival, HEUER was seen on the motel's surveillance footage making furtive movements and hiding two bags outside his room.  During a subsequent recorded conversation, HEUER states that he "got so lucky" and "grabbed all of his shit" and threw it into his backpack before the EMTs arrived.  HEUER is also heard admitting to the presence of fentanyl in his motel room, and later, suggesting that C.N. may have "just did fent[anyl] by accident."  Witness testimony further confirms that HEUER and his associates sell drugs surreptitiously laced with fentanyl.

8.   In July 2019, the Burbank Police Department arrested HEUER with drugs for distribution, including fentanyl.  HEUER pled no contest to California Health and Safety Code Section 11378, Possession of Methamphetamine for Sale, and on November 22, 2019, HEUER was sentenced to 16 days of jail and three years of formal probation, including three months at a residential treatment facility.  HEUER currently resides at the SUBJECT PREMISES, a room at that residential treatment facility.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

9.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Overdose Death of C.N**

10.    On or about September 29, 2019, C.N. was found dead of a suspected drug overdose by an employee of the Beverly Merlot Motel at 8755 W. Olympic Boulevard, Room 307, Los Angeles, CA, 90035 (hereinafter, the "Beverly Merlot Motel").[1]  The employee, William Villalta, told LAPD officers that he responded to a service request for a clogged toilet in Room 307 at approximately 2:00 p.m.  As described below, Room 307 was registered to HEUER, who had been staying in that room for approximately a week prior.

11.    Villalta also told LAPD officers that earlier that day, Villalta had visited Room 307 on two prior occasions and saw HEUER, C.N., and an unknown male in the room.  During his visits, Villalta saw drugs and drug paraphernalia in the room. When he returned at approximately 2:00 p.m. to fix the clogged toilet, HEUER and the unknown male were not present.  Villalta found C.N. alone on the bed and propped up against the wall not breathing.  Villalta attempted to feel C.N.'s pulse but could not locate it.  Shortly after finding C.N., Villalta also called HEUER from his cellphone.

---

[1] An autopsy and toxicology report by the Los Angeles Medical Examiner-Coroner is forthcoming.

12.  I reviewed surveillance footage from a security camera
outside Room 307 which captures some of the audio from
Villalta's call, in which Villalta can be heard saying:  "What
the fuck do I do?  T.J., T.J., T.J., [referring to HEUER] I need
your help, I need your help, I need your help.  Dude, nobody's
here, nobody's here, that's why I'm tripping.  You guys left her
alone [unintelligible] she's dead . . .."

13.  Also based on the surveillance video, moments later,
Villalta can be heard speaking with an unknown male and asking
if he knows how to administer Narcan –- an opioid antagonist
commonly used to reverse the effects of an opioid overdose.  The
unknown male responds that he does not know how.  Villalta later
told LAPD officers that he attempted to perform CPR on C.N. but
to no avail.

14.  Villalta is also observed on the security footage
frantically pacing the hallways yelling for HEUER.  Minutes
later, HEUER appears with a calm demeanor and tells Villalta to
"calm down."  An unidentified voice then asks HEUER if he has
"fent" in there, to which HEUER replies "yeah."  (I know that
fent is a slang term for fentanyl.)

15.  Before the EMTs arrived, HEUER is seen on surveillance
footage making furtive movements and hiding a backpack behind an
exit door.  Moments later, HEUER disappears from the
surveillance footage and reemerges with a duffle bag, which he
then hides behind the door in a neighboring room (Room 309).  On
a subsequent recording made later that evening, discussed below,
HEUER describes the foregoing action: "Dude, yo check this out.

When that happened bro, I got so lucky that before the fucking
EMTs got here and [unintelligible] was running out, I said
'fuck' and I grabbed all of my shit and fucking boom, got it
into my backpack . . .."

16.   After LAPD officers arrived and interviewed several
witnesses, HEUER spoke with the officers.  HEUER told LAPD
officers that he knew C.N.  HEUER stated that C.N. came over to
HEUER's room (Room 307) the day prior, and that C.N. used
"Special K" throughout the morning.  (I know "Special K" is a
slang term for ketamine.)  HEUER stated he last saw C.N. at or
around 2:30 p.m. on or about September 29, 2019.  HEUER stated
that C.N. appeared to be sleeping on the bed when HEUER left
Room 307.

     **B.   Interview of A.H.**

17.   On or about October 16, 2019, I, along with other law
enforcement personnel, interviewed A.H., a witness who requested
to remain confidential at this time.  During the interview, A.H.
was shown a photograph of HEUER from which he/she was able to
identify HEUER.  A.H. stated that he/she received a recorded
conversation from Sarah Theden ("Theden"), a friend of C.N.,
between Theden, HEUER, and another individual that occurred in
the early morning hours of September 30, 2019.

18.   I have reviewed the recording and can identify HEUER's
voice heard therein.  HEUER stated C.N. was in a "K-Hole", and
C.N. had shallow breathing when HEUER left the room.  (I know
that "K-Hole is a slang term describing the result of consuming
ketamine and how the body reacts to ketamine.)  HEUER further

stated Villalta called HEUER stating that C.N. was overdosing.
HEUER recalled entering the Room 307 and seeing Villalta and
another individual giving C.N. CPR.  In the recording, HEUER
stated he and C.N. were hanging out the past two days before
C.N.'s death.  HEUER also stated that he had no idea that C.N.
did not do "fetty".  (I know that fetty is a slang term for
fentanyl.)  HEUER stated that "I just made a quick assumption
when she started going down that that yup, she just did fent by
accident."

19.  In addition to the foregoing recording, A.H. also
provided the undersigned a photograph of a note from C.N.'s
notebook.  The note, which A.H. states is C.N.'s handwriting,
states: "TJ Prices? 1. 600 1/2 oz. girl. 2. $280 x3g's fendi. 3.
$3.50 bars. 4. 700 piece. Blk."  (I know that "girl" is a slang
term for cocaine, "fendi" is a slang term for fentanyl, "bars"
is a slang term for Xanax, and "black" or "blk" are slang terms
for heroin.).  Based on my training and experience, I believe
C.N.'s note lists a price schedule for various drugs HEUER
offers for sale.

**C.   Interview of S.L.**

20.  On or about October 30, 2019, I, along with law
enforcement personnel interviewed S.L., another witness who
requested to remain confidential at this time.  During the
interview, S.L. was shown a photograph of HEUER from which
he/she was able to identify HEUER.  S.L. stated that she has
purchased drugs from HEUER and his associate in the past.  S.L.
stated that approximately five weeks from this date, S.L.

purchased Xanax bars from HEUER's associate, whom S.L. knows as "Logan." S.L. stated she ingested a portion of the suspected Xanax bar and overdosed, which was unusual for the drug type and amount S.L. ingested.

21.   S.L. stated a few days later, he/she met HEUER at the Beverly Merlot Motel to purchase additional drugs from HEUER. Several unidentified individuals were in the motel room with HEUER. S.L. purchased Xanax bars and heroin from HEUER. Prior to ingesting the Xanax bar, S.L. asked HEUER if the Xanax bars were the same ones that S.L. purchased from Logan several days prior. HEUER responded affirmatively and told S.L. that Logan gets Xanax bars from HEUER and works for HEUER.

22.   S.L. recalled that after ingesting a portion of the Xanax bar in HEUER's motel room, S.L. passed out. Shortly thereafter, S.L. was found outside Sage Clinic, a sober living house on 8701 W Olympic Boulevard, Los Angeles, CA, 90035, where a Sage Clinic employee administered four units of Narcan to S.L. After S.L.'s overdose, S.L. was given a drug urinalysis, which revealed the presence of fentanyl. S.L. stated she did not knowingly ingest fentanyl and suspects that the Xanax bars were pressed, or suspected to be counterfeit, pills that contained fentanyl.

**D.   HEUER's July 2019 Drug-Related Arrest**

23.   Based on my review of police reports, I know that on or about July 25, 2019, HEUER was pulled over and arrested by the Burbank Police Department for, inter alia, violation of Health and Safety Code Section 11378, Possession of Controlled

Substance for Sale.  A probable cause search of HEUER's vehicle revealed multiple clear plastic baggies containing a white crystalline substance, believed to be methamphetamine, in amounts larger than commonly possessed for personal use.  The officers further found two plastic baggies containing a blue-ish crystalline substance, which were later determined to be fentanyl.  The officers also found approximately 75 empty clear plastic baggies, three cell phones, and a digital scale.

24.  Based on my training and experience, I know that people who are involved in the sales of narcotics tend to carry multiple plastic baggies to distribute drugs.  I also know that possessing multiple cell phones and a digital scale is consistent with narcotics distribution.

25.  Based on my review of HEUER's criminal history records, I understand that based on the foregoing conduct, HEUER was charged with Possession of Controlled Substance for Sale, in violation of Health and Safety Code Section 11378, in the Superior Court of the State of California, County of Los Angeles, case number GA106214.

26.  The records in that case show that HEUER pled no contest to Possession of Controlled Substance for Sale in violation of Health and Safety Code Section 11378.  On November 22, 2019, HEUER was sentenced to 16 days of jail and three years of formal probation that includes three years of search conditions.  In addition, HEUER was ordered to participate in six months of drug treatment, which consists of three months of residential treatment and three months of outpatient treatment.

### E.   HEUER Lives at the SUBJECT PREMISES

27.   On or about November 20, 2019, the Honorable Frederick M. Mumm, United States Magistrate Judge, authorized warrants for cell-site, GPS, and Stingray information pertaining to HEUER's phone, as described more fully in the applications at 19-mj-4946 and 19-mj-4947.

28.   Based on the foregoing warrants, I traced HEUER's phone location to the Villa Treatment Center located at 5051 Hood Dr., Woodland Hills, CA 91364.  The Villa Treatment Center is a residential treatment facility operating out of what appears to be a single-family home.  I have now confirmed with the Los Angeles County Probation telephone line for law enforcement that HEUER is residing at the Villa Treatment Center, for the next three months as part of his court-ordered residential treatment in his state case.

29.   Based on my search of Villa Treatment Center in a publicly available database, I understand that the Villa Treatment Center appears to be a single-family home in a residential area that is approximately 3,823 square feet in total, with five bedrooms and five bathrooms.  Based on my training and experience, I understand that patients in such treatment facilities are commonly assigned a room in which to live.  I also know, based on my training and experience that it is common practice for residential treatment centers to allow their clients to use their personal belongings, such as cell phones, but that at times they will store such items outside the clients' rooms in designated storage areas.  Based on this

10

common practice, as described more fully in Attachments A-1 and
A-2, I am requesting a search warrant to search and seize items
within HEUER's immediate vicinity and control as well as the
SUBJECT PREMISES, which is his room at the Villa Treatment
Center including any bathrooms, storage units, garages, detached
structures, sheds, safes, lockers, and safety deposit boxes
assigned for HEUER's use, and HEUER's vehicles parked at the
SUBJECT PREMISES.

30.   Based on my training and experience, given the
sensitivity of this investigation and the small size of the
Villa Treatment Center (the size of a single-family home), I
believe that contacting the Villa Treatment Center earlier than
the date of execution of the search warrant will result in Villa
Treatment Center staff or another patient informing HEUER of the
investigation.  This would cause HEUER to destroy evidence,
interfere with the investigation, and possibly intimidate
witnesses and/or flee prosecution.

31.   So as to have a minimal impact on the other patients
at the facility and the operations of the facility itself, law
enforcement will attempt to identify HEUER's assigned room and
related spaces, including by asking the staff at the Villa
Treatment Center to identify HEUER's room and any storage units,
garages, detached structures, sheds, safes, lockers, and safety
deposit boxes assigned for HEUER's use, on the date of execution
of the search warrant.

## V. <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

32. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, on their person, and in their residences and vehicles.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

12

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices, on their person, and in their residences. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.   Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often kept on or near their person and stored in their residences and vehicles.

f.   Drug traffickers often keep drugs in places where they have ready access and control, such as on or near their person and at their residence.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking.  These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of her criminal activity.

g.   It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and

13

suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

33.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[2] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

14

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

15

34.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises or in a short period of time for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

35.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

16

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HEUER's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of HEUER's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

36. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

17

## VII. <u>CONCLUSION</u>

37.   For all of the reasons described above, there is probable cause to believe that the items to be seized described in Attachment B will be found in a search of HEUER's person and the SUBJECT PREMISES as described in Attachments A-1 and A-2.  I also request that the Court order the staff at Villa Treatment Center to make the disclosures required in Section V above, as described in Attachment A-2.


_____
LOGAN D. BONIFAS
DEA Special Agent


Subscribed to and sworn before me
this _____ day of December, 2019.


_____
HONORABLE FREDERICK F. MUMM
UNITED STATES MAGISTRATE JUDGE